## HODGES *v.* DAWDY.

Opinion delivered July 8, 1912.

1.  MANDAMUS—VALIDITY OF STATUTE.—Mandamus will not lie to compel an officer to do an act which is forbidden or not authorized by law; and a court, when called upon to grant the writ, may inquire into the validity of the statute which imposes upon the officer the duty which he has failed to perform.  (Page 589.)

2.  SAME—INITIATIVE AND REFERENDUM—COMPELLING SUBMISSION . OF INITIATED LEGISLATION.—Upon a petition for mandamus to compel the Secretary of State to file and certify a proposed law to be

voted on under the Initiative and Referendum Amendment, the enabling act (of June 30, 1911) makes it the duty of the court to inquire whether the proposed measure falls within the terms of the Constitution as amended, and if it does to compel its submission to the people, and otherwise to restrain its submission to the people. (Page 591.)

3. CONSTITUTIONAL LAW—EFFECT OF INITIATIVE AND REFERENDUM AMENDMENT.—The Initiative and Referendum Amendment, whereby the people of the State reserve to themselves the power to legislate directly by the initiative or referendum, does not abrogate the existing Constitution and laws of the State except such provisions as are necessarily repugnant thereto. (Page 591.)

4. SAME—CONSTRUCTION OF AMENDMENT.—In determining the meaning of a constitutional amendment adopted by a popular vote, opinions expressed during the campaign which preceded the election concerning the interpretation of the amendment are not binding upon the courts. (Page 592.)

5. SAME—CONSTRUCTION OF AMENDMENT.—In construing constitutional amendments, such an interpretation should be made in cases of ambiguity that inconvenience and absurdity may be avoided. (Page 593.)

6. SAME—POWER TO SUPPLY OMISSIONS.—Where provisions are left out of a constitutional amendment proposed by the Legislature, either by design or mistake of the Legislature, the courts have no power to supply them. (Page 596.)

7. SAME—INITIATIVE AND REFERENDUM AMENDMENT—CONSTRUCTION OF.— The Initiative and Referendum Amendment to the Constitution provides that the people *of each municipality, each county* and of the State reserve to themselves power to propose laws and amendments to the Constitution and to enact or reject the same at the polls; that "not more than 8 per cent. of the legal voters shall be required to propose any measure;" that "the whole number of votes cast for the office of Governor at the regular election last preceding the filing of any petition for the initiative or for the referendum shall be the basis on which the number of legal votes necessary to sign such petition shall be counted;" and that "the style of all bills shall be, 'Be It Enacted by the People of the State of Arkansas.'" *Held* that the words "each municipality" and "each county" are surplusage unless treated merely as words of emphasis, and that they confer no power upon the voters of a municipality or county to initiate legislation. (Page 596.)

8. SAME—CONSTRUCTION.—Though courts may supply such words in a constitutional amendment as are necessary to complete the sense and to express the obvious legislative intent, where it appears from the context that words have been inadvertently

omitted, they can not supply additional words of substantial import if the intent of the framers does not appear from the language used. (Page 597.)

9. SAME—CONSTRUCTION.—The rule of construction that where general terms or expressions in one part of a statute are inconsistent with more specific or particular provisions in another part, the particular provisions will be given effect as clearer and more definite expression of the legislative will, is applicable in the interpretation of constitutional amendments. (Page 598.)

10. LEGISLATURE—DELEGATION OF POWER—CONSTRUCTION.—Under act June 30, 1911, providing that 8 per cent. of the legal voters of any county, city or town may "propose any measure, not inconsistent with the general laws or Constitution of the State, applicable only to such county or municipality," *held* that if the Legislature was authorized to delegate such power, which is not decided, the act did not authorize a county or municipality to propose a local measure inconsistent with the general laws of the State. (Page 599.)

Appeal from Pulaski Circuit Court; *F. Guy Fulk*, Judge; reversed.

*Hal L. Norwood*, Attorney General, and *Wm. H. Rector*, Assistant, for appellant; *Callaway & Huie, Cravens & Cravens, Gibson Witt* and *Morton & Morton*, of counsel.

It was incumbent on appellees to show in this complaint that they had a legal right to have appellant certify the petitions out to be voted on by the people of the respective counties, and, failing in that, the demurrers should have been sustained, and the complaints dismissed. 1 Ark. 11; *Id.* 121; 6 Ark. 9; *Id.* 437; 26 Ark. 482; *Id.* 100; 27 Ark. 382; 45 Ark. 122; 48 Ark. 80; 87 Ark. 379. The office of Secretary of State is not to be made the dumping ground for petitions of every nature and character which do not fall within the purview of the Initiative Amendment. 139 Am. St. Rep. 656. The proposed local measures are inconsistent with the general laws of the State. Art. 7, § 28, Const. 1874, and chap. 38, Kirby's Dig. The legislative power was originally in the people of the whole State. 33 Ark. 497; 92 U. S. 307.

Any construction should be discarded which would lead to absurd consequences. 40 Ark. 431; 100 S. W. 239; Sedgwick on Constitutional and Statutory Construction, 196. Where general provisions are inconsistent with more specific provisions in another part of a statute or Constitution, the particular

provisions will be given effect as clearer or more definite expressions of the people's will. 22 Mich. 332; 12 Ga. 526; 132 Ill. App. 376; 106 Wis. 411; 185 U. S. 83. The county court has jurisdiction of all county seat matters. Sec. 28, art. 7. Const.; 33 Ark. 191; 43 Ark. 62; 5 Ark. 21; 55 Ark. 323. It is proposed to change the county seat by a majority of the votes cast on the question. The general law prohibits such change except on the consent of a majority of qualified voters in the county. Sec. 3, art. 13, Const. 1874.

Amendment No. 10 is to be read in connection with the whole Constitution, and, if possible, harmonized with the general terms, tenor and spirit thereof. 93 Ark. 228; 27 Ark. 648; 51 Ark. 534; 60 Ark. 343; 12 Ark. 101; 2 Ark. 98; 4 Ark. 473; 24 Cal. 518.

*Miles & Wade, Dan W. Jones, Walker S. Danaher, Sam M. Wassell, I. L. Autrey, Geo. A. McConnell, Jessie A. Harp,* and *Chas. Jacobson,* for appellees.

A county can exercise power of legislation granted to it by the Legislature. 143 Ky. 422. The proposed acts are not in conflict with the Constitution. 26 Okla. 403; 203 Mo. 408; 45 Ark. 400; 54 Ark. 658; 145 S. W. 892. The existing law provides the necessary machinery for the submission of the proposed acts to the people of their respective counties. Mandamus is the proper remedy. 26 Okla. 403. The people of a municipality, may, under Amendment No. 10, initiate an ordinance, the effect of which would be to exempt them from the provisions of § 2041, Kirby's Digest. 59 Ark. 530; 75 Ark. 125; 80 Ark. 337; 35 Ark. 69; 92 Ark. 4.

The Legislature has the right to set aside or suspend a law at pleasure. Sec. 12, art. 2, Const. The defendant, being a ministerial officer, can not raise the question as to whether the proposed laws are unconstitutional, in a mandamus proceeding. 16 S. C. 39; 30 S. C. 524; 43 S. C. 11; 64 S. C. 564; 47 L. R. A. 512.

McCULLOCH, C. J. The plaintiffs, J. M. Dawdy and other citizens of Dallas County, presented to the Secretary of State their petition to initiate a local or special statute directing the removal of the county seat of that county from Fordyce, its present location, to Princeton. The petition contained the

signatures of 8 per cent. of the qualified electors of Dallas
County, and they claim the right to initiate said statute, and
the right of the people of the county to enact it, under the recent
amendment to the Constitution known as the Initiative and
Referendum, which was adopted by the people of the State in
the year 1910, and which reads as follows:

"That section one, article five, of the Constitution of the
State of Arkansas be amended so as to read as follows:

"Section 1.   The legislative powers of this State shall be
vested in a General Assembly, which shall consist of the Senate
and House of Representatives, but the people of each munic-
ipality, each county, and of the State, reserve to themselves
power to propose laws and amendments to the Constitution
and to enact or reject the same at the polls as independent
of the legislative assembly, and also reserve power at their
own option to approve or reject at the polls any act of the
legislative assembly.   The first power reserved by the people
is the Initiative, and not more than 8 per cent. of the legal voters
shall be required to propose any measure by such petition,
and every such petition shall include the full text of the measure
so proposed.   Initiative petitions shall be filed with the
Secretary of State not less than four months before the elec-
tion at which they are to be voted upon.   The second power
is a Referendum, and it may be ordered (except as to laws
necessary for the immediate preservation of the public peace,
health or safety) either by the petition signed by 5 per cent.
of the legal voters or by the legislative assembly as other bills
are enacted.   Referendum petitions shall be filed with the
Secretary of State not more than ninety days after the final
adjournment of the session of the legislative assembly which
passed the bill on which the referendum is demanded.   The
veto power of the Governor shall not extend to measures re-
ferred to the people.   All elections on measures referred to the
people of the State shall be had at the biennial regular general
elections, except when the legislative assembly shall order a
special election.   Any measure referred to the people shall
take effect and become a law when it is approved by a majority
of the votes cast thereon, and not otherwise.   The style of all
bills shall be, 'Be It Enacted by the People of the State of
Arkansas.'   This section shall not be construed to deprive

any member of the legislative assembly of the right to introduce any measure. The whole number of votes cast for the office of Governor at the regular election last preceding the filing of any petition for the Initiative or for the Referendum shall be the basis on which the number of legal votes necessary to sign such petition shall be counted. Petitions and orders for the Initiative and for the Referendum shall be filed with the Secretary of State, and in submitting the same to the people' he and all other officers shall be guided by the general laws and the acts submitting this amendment until legislation shall be specially provided therefor."

The General Assembly of 1911 enacted a statute, approved June 30, 1911, pursuant to said constitutional amendment, providing means for carrying the same into full effect. It contains certain provisions concerning the initiation or reference of local legislation for counties and municipalities. It provides that "5 per cent. of the legal voters of any county, city or incorporated town may, by petition, order such referendum upon any law * * * applicable only to such county or municipality;" and that 5 per cent. of the legal voters of any municipality may, by petition, order the reference of any ordinance passed by the council. It also provides that "8 per cent. of the legal voters of any county or of any city or incorporated town may, at any time more than four months before any regular general election, propose any measure, not inconsistent with the general laws or Constitution of the State, applicable only to such county or municipality," and that "when any measure proposed of local application only to any county or municipality shall have received a majority of the legal votes cast upon such proposed measure at the election at which the same shall have been voted upon and the result of the vote legally proclaimed, as hereinafter provided, the same shall be and become a law for such county or municipality."

The Secretary of State, acting upon the advice of the Attorney General, declined to certify out the proposed law, so that it may be voted on by the people of Dallas County; and the plaintiffs instituted this action in the circuit court of Pulaski County to compel that officer, by writ of peremptory mandamus, to do so. The Attorney General appeared for the

Secretary of State and demurred to the complaint. The demurrer was overruled, and, upon refusal of the defendant to plead further, final judgment was rendered awarding the writ of mandamus as prayed for.

Other petitions were presented to the Secretary of State for the initiation of other local statutes, and a like course was pursued as to each of them. An appeal has been prosecuted in each case, and all of them have been argued together in this court. One of the petitions was to initiate a local statute directing the removal of the county seat of Montgomery County; another a statute fixing the salaries of the officers of Sebastian County; another a statute to regulate horse-racing and to permit betting on horse-races in Garland County; and another to initiate an ordinance of the council of the city of Little Rock permitting games of baseball to be played on any day of the week, including Sunday. The conclusion which we reach in the first case is decisive of them all, and all of them will be disposed of in one opinion.

It is contended by learned counsel for plaintiffs that, aside from the main question as to the right of 8 per cent. of the voters of a county or municipality to initiate a local measure, the Secretary of State can not refuse to certify out an initiated bill because, in his opinion, the same is not subject to the reserved power of the people with respect to initiating legislation; and that, regardless of the validity of a proposed law, the Secretary of State should be compelled to certify it out in accordance with the petition. The case of *Threadgill v. Cross*, 26 Okla. 403, 138 Am. St. Rep. 964, is cited in support of that contention. On the other hand, the Attorney General relies on the case of *State v. Roach*, 230 Mo. 408, 139 Am. St. Rep. 639, to sustain his contention on this point, and we think he is correct in his contention that the court should not compel the Secretary of State to certify out a proposed measure which is found not to be subject to the initiative power of the people. The Secretary of State is an executive officer, and acts ministerially, and not in a judicial capacity. He is not called upon to determine the constitutionality or legality of a statute, but he can not be compelled to execute or obey an invalid statute. *Van Horn v. State*, 46 Neb. 62. We are aware that there is wide conflict in the authorities on this question, but we believe that

our court is already committed to the rule announced by the Nebraska court in the case above cited, and that the rule is sound.

Judge SMITH, in delivering the opinion of this court in *Little Rock & F. S. Ry. Co.* v. *Worthen,* 46 Ark. 312, said:

''Officers of the executive department are not bound to execute a legislative act which, in their judgment, is repugnant to the Constitution. Their primary allegiance is due to the Constitution; and if there be a conflict between the two, the Constitution is the higher law, or, rather, the supposed law is not a law at all, being null and void.''

Mandamus will not lie to compel an officer to do an act which is forbidden or not authorized by law, and a court, when called upon to grant the writ, may inquire into the validity of the statute which imposes upon the officer the duty he has failed to perform. *Chicot County* v. *Kruse,* 47 Ark. 80.

Stating the proposition conversely, a person applying for a mandamus to compel an officer to do a certain thing must show a valid act which imposes on such officer the duty of performing that act; otherwise, he can not complain of the nonperformance.

It is not correct, however, to assume the position here that the Secretary of State has undertaken to declare the proposed measures unconstitutional. He has, upon the advice of the Attorney General, merely said that the bills were not of a character which fell within the terms of the recent amendment to the Constitution nor the Enabling Act. The Enabling Act itself prescribes the practice for the courts in determining whether a proposed measure shall or shall not be certified out by the Secretary of State. It provides, in express terms, that:

''If the Secretary of State shall refuse to accept and file any petition for the Initiative or for the Referendum, any citizen may apply within ten days to the circuit court or to the judge thereof in vacation for a writ of mandamus to compel him to do so. If it shall be decided by the court or judge that such petition is legally sufficient, the Secretary of State shall then file it. * * * On a showing that any petition filed is not legally sufficient, the court or judge may enjoin the Secretary of State and all other officers from certifying or print-

ing on the official ballot for the ensuing election the ballot title of such measure."

The act clearly makes it the duty of the court, on an application for mandamus, to inquire whether the proposed measure falls within the terms of the Constitution as amended, and, if it does, to compel submission to the people; otherwise to restrain the submission of it to the people. It follows therefore that, unless it be found that the measure proposed by the plaintiffs is subject to the initiative power of the people, and that the petition is legally sufficient, according to existing laws, the Secretary of State can not be compelled to file it and certify the measure out for submission to the people.

The attorneys have argued the cases with much earnestness and skill and have displayed commendable zeal in their search for authorities bearing on the point involved—that is to say, the correct interpretation of the language of the constitutional amendment; but after all it is largely a question of first impression, and little aid is obtained from the adjudged cases. In fact, the principle of the initiative and referendum, as applied in its present form and scope to direct legislation by the people, is comparatively of recent origin, having been adopted by a few of the American States in the last decade, or more, and there are few decisions of the courts on the subject. Most of them are decisions of the Supreme Court of Oregon, where the principle was put into operation by an amendment adopted by the people of that State in the year 1902. The only useful light shed by the decisions on the particular question now before us is this: The constitutional amendment whereby the people of the State reserve to themselves the power to legislate directly by the initiative or referendum does not abrogate the existing Constitution and laws of the State except such provisions as are necessarily repugnant thereto. *Kadderly* v. *Portland,* 44 Ore. 118; *State* v. *Richardson,* 48 Ore. 309; *State* v. *Schluer,* (Ore.) 115 Pac. 1057; *State* v. *Roach,* 230 Mo. 409.

The amendment being the last expression of the popular will in shaping the organic law of the State, all provisions of the Constitution which are necessarily repugnant thereto must, of course, yield, and all others remain in force. It is simply fitted into the existing Constitution, the same as any other amendment, displacing only such provisions as are found to

be inconsistent with it. Like any other new enactment, it is a "fresh drop added to the yielding mass of the prior law, to be mingled by interpretation with it." *State* v. *Sewell*, 45. Ark. 387. In the construction of its terms, and in the determination of its scope and effect, the courts should follow settled rules of interpretation.

The question presented now for our determination, in construing the amendment, is whether the insertion of the words "each municipality" and "each county" gives it a meaning which authorizes the voters of a municipality or county, apart from the other people of the State, to initiate and enact local legislation. The Attorney General and counsel arrayed with him on that side contend that those words, as they appear in the amendment, are meaningless and should be treated as redundant; or that, if they be treated as conferring power upon the voters of a municipality or county to initiate and enact local legislation, the provision is not self-executing, and that such legislation must conform to the Enabling Act passed by the Legislature, which provides that all such matters shall not be inconsistent with the general laws and Constitution of the State. Counsel on the other side contend that the words mentioned, and others which must be read into the provision by necessary implication, empower the people of a municipality or county to initiate and enact local measures; that the provision in that respect, as well as in all others, is self-executing; and that the limitation in the Enabling Act is unconstitutional and void.

Both sides urge upon our attention the respective constructions publicly put on the amendment by its advocates and opponents during the political campaign which preceded its adoption. But we decline to consider them as proper aids to the judicial determination of its meaning. When the debates arose over the question of adoption by the people, the amendment had already been framed by the Legislature and referred to the people, and the opinions expressed during the progress of the campaign did not enter into the shaping of the language of the amendment so as to shed light on its intended meaning. However persuasive those opinions may be, on account of the learning and distinguished ability of many of the men who expressed them, they are entitled only to the same consideration

as if expressed now. The fact that they were expressed as arguments during the campaign adds no force to them as aids in interpreting the meaning of the language used in the amendment.

Nor can the fact that a majority of the votes of the State, as reasons for adopting the amendment, are presumed to have accepted the interpretation placed upon it by its advocates have any force with us in construing its meaning. The people of the State have approved the principle of the initiative and referendum by the adoption of the amendment, and that has ceased to be a political question. It remains only for the court to give it a rational interpretation for the purpose of carrying out the popular will as expressed by the language used in the instrument which the people have voted upon and adopted.

A literal reading of the first part of the amendment leads to the meaning that the people of each municipality and of each county "reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls," and also "to approve or reject, at the polls, any act of the General Assembly." Without limitation, those words mean that the people of any municipality or county may enact *any* law or constitutional amendment, however obnoxious to the other people of the State or inconsistent with general laws. That would completely destroy the sovereignty of the people of the State as a whole and create sovereign power in the people of each municipality and county. Such a construction leads to an absurdity, and must be rejected for that reason. *State* v. *Smith*, 40 Ark. 431. It is a settled maxim of the law that "in cases of ambiguity such an interpretation should always be made that what is inconvenient and absurd may be avoided." Kinney's Law Dictionary, 398. Now, if the literal meaning of the words of the amendment is to be discarded on account of the absurd results to which it would lead, what meaning shall we attach to them? Learned counsel for plaintiffs say that we can construe the words "each municipality" and "each county" to refer only to the power to initiate and to have reference to local measures, and, in order to give the amendment a reasonable interpretation, we should place that limitation upon the power of the people of municipalities and counties. But that construction would require

us to read into the amendment many words that its framers failed to put there, and also to transpose parts of sentences in order to limit them to the meaning suggested. In fact, it is difficult to see how the amendment, as it was framed, can be given that meaning without inserting a complete sentence limiting the power to be exercised by people of municipalities and counties and prescribing means of carrying out the limited power. The language found there, as it stands, not only fails to express the idea that only local measures can be initiated by the people of municipalities and counties, but it fails to provide means for submitting the question to the people. All of the provisions made therein for initiating or referring measures manifestly relates to general laws and constitutional amendments.

Again, if we attempt to read into the amendment words applying and limiting the power of the people of municipalities and counties to the enactment of local laws, it will be necessary to read out of it the application of those words to constitutional amendments, for the same words which give the people the power to enact laws give them the power to adopt amendments to the Constitution. The language actually found in the amendment is that "the people of each municipality, each county, and of the State reserve to themselves the power to propose laws and amendments to the Constitution, and to enact or reject the same at the polls." So, if by judicial interpretation we insert the words necessary to apply the power only to local bills, we must separate them so as to arrest their operation as to constitutional amendments.

It is also manifest that, if we were to read into the amendment such additional words as would apply and limit the power of the people of municipalities and counties to local measures, it would be necessary to add still further words limiting the exercise of that power to such measures as are not inconsistent with the general laws of the State; otherwise, it would lead to absurd results, as we have already shown.

Therefore, in order to give the meaning contended for by plaintiffs, we must employ the process of separation as well as the addition of words and sentences.

The phraseology of the amendment, with respect to the power of the people, is significant in employing words which

necessarily refer to the power of the people of the whole State, and not a part or subdivision thereof. It declares that the people "reserve to themselves power to propose laws and amendments to the Constitution;" and also "reserve power at their own option to approve or reject at the polls *any* act of the legislative assembly."

The amendment does not confer power. It reserves it. Now, the sovereign power rested, both before and since the adoption of this amendment, in the people of the whole State. Power was delegated by the whole people to the General Assembly, but the purpose of this amendment was to reserve to themselves the legislative power. In other words, they withdrew the exclusive legislative power theretofore delegated to the General Assembly, and reserved the right to exercise it themselves under certain conditions. The people of each municipality and county never having possessed the sovereign legislative power, apart from the other people of the State, could not reserve such power. It could be conferred upon them by the people of the whole State, but they could not reserve that which they did not possess and had no power to take for themselves. It is evident from the phraseology of the amendment that it was intended as a reservation of power, and not a delegation of power. We do not mean to say that the word "reserve" could not be used in a sense which meant a delegation of power, but the use of the word does not, ordinarily, convey that meaning, and the fact that it was used shows that the framers of the amendment intended to declare a reservation of the sovereign power in the whole people, where it had always inherently resided, except to the extent which they had delegated it.

It is also worthy of note that the amendment prescribes an enacting clause the form of which seems to apply peculiarly to laws initiated and adopted by the people of the whole State, and not by the people of any particular locality. It provides that "the style of all bills shall be, 'Be It Enacted by the People of the State of Arkansas,'" which is a clear indication that the reservation of power is to the whole people, and not to any particular part or subdivision.

There is found plainly written in the amendment the limitation that 8 per cent. of the legal voters shall be required

to propose any measure, and that *"the whole number of votes cast for the office of Governor at the regular election last preceding the filing of any petition for the Initiative or for the Referendum shall be the basis on which the number of legal votes necessary to sign such petition shall be counted."* This requirement is not modified by the words "each municipality" and "each county," so as to limit the number of voters required to initiate or refer a local measure. It is a requirement which must be applied to all measures, if the language is to be interpreted in its ordinary meaning. And, in order to give it any other meaning, we must read into it additional words of substantial import. Settled rules of construction restrain the court from reading words into a statute or constitutional amendment which substantially add to, or take from, it as framed. *Road District v. Glover*, 89 Ark. 513. There are instances of the courts supplying such words as were necessary to complete the sense and to express the obvious legislative intent, where it appeared from the context that the words had inadvertently been omitted from the statute, but in such case the intent of the framers of the statute must appear from the language used, and not from mere inference or conjecture.

"The rule is that whatever is necessarily or plainly implied in a statute is as much a part of it as that which is expressed. But a statute should not be extended beyond the fair and reasonable meaning of its terms, because of some supposed policy of the law, or because the Legislature did not use proper words to express its meaning. * * * Where a statute is incomplete or defective, whether as a result of inadvertence, or because the case in question was not foreseen or contemplated, it is beyond the province of the courts to supply the omissions, even though as a result the statute is a nullity." 36 Cyc. pp. 1112 and 1113.

"Courts can not," says Mr. Endlich, "supply legislative defects and omissions, although, by reason of such, the statute becomes, in whole or in part, practically unenforceable or inoperative." Endlich on Interpretation of Statutes, § 22.

In *Crawford* v. *Spooner*, 6 Moore, P. C. L., Lord Brougham said:

"We can not aid the legislature's defective phrasing of the

act; we can not add, and mend, and by construction make up, deficiencies which are left there."

And in *Hobbs* v. *McLean,* 117 U. S. 567, it is said:

"When a provision is left out of a statute, either by design or mistake of the Legislature, the courts have no power to supply it. To do so would be to legislate and not to construe."

The rules of construction applicable to statutes ordinarily apply with equal force to constitutions or amendments thereof, though some courts hold to even more restricted rules in the construction of provisions of the organic law. It is safe, however, to say that the rules stated in the authorities above cited are applicable alike to constitutional provisions and statutes.

It is insisted that the words "each municipality" and "each county" must be given some force, especially when it is seen, from an inspection of the journals of the Legislature, that those words were added to the amendment after one of the houses had adopted the resolution. It is argued that this shows convincingly that something additional was intended by supplementing those words. The meaning of the framers must be gathered from the language used.

"The question for the interpreter is not what the Legislature meant, but what its language means." Endlich on Interpretation of Statutes, § 7.

They may have intended something which they failed to express, and it is not the province of the court to supply the additional words essential to an expression of that intention.

If, therefore, the literal meaning of the declaration, "the people of each municipality and each county" "reserve to themselves the power to propose laws and amendments to the Constitution," must be rejected, because it leads to absurd and impossible results, and if it is beyond the power of the courts to add, by construction, the words necessary to apply and limit that power to local measures not inconsistent with the general laws of the State, then the added words "each municipality" and "each county" are meaningless so far as adding any substantive force to the amendment.

It is said that the words as used are redundant. We think it is more correct to say that they can only be construed as

words of emphasis. The framers of the amendment were declaring a new principle in government by the people—at least new to the people of this State—and words of emphasis were not inappropriate. We are not bound to search for the reasons, but they may have meant to declare that 8 per cent. of the voters of the whole State, whether of one or more municipalities or counties, could initiate a law. They may have meant to emphasize the power of the people of the State to initiate any measure, whether general or local in its scope, by a petition signed by 8 per cent. of the voters without any hindrance or other requirement. At any rate, we find written in the amendment a plain provision requiring, in order to initiate any measure, a petition signed by 8 per cent. of the voters of the State, taking as a basis "the whole number of votes cast for the office of Governor," and words can not be added by the court to modify it with respect to any kind of legislation.

Another well-settled rule of construction is that "where general terms or expressions in one part of a statute are inconsistent with more specific or particular provisions in another part, the particular provisions will be given effect as clearer and more definite expressions of the legislative will." 36 Cyc. 1130.

Applying this rule to the provision now before us, it results that the specific requirement that the petition must be signed by 8 per cent. of the voters restrict the more general language referring to municipalities and counties.

It is evident that the words "each municipality" and "each county" were inaptly thrust into the amendment as originally framed in a way that they express nothing and mean nothing unless they be treated merely as words of emphasis.

We are convinced, after a careful consideration of the whole matter, that any other meaning can not be given to the amendment than that which we have indicated, and that it does not confer power on the voters of a municipality or county, apart from the other people of the State, to initiate any kind of legislation. The amendment, construing its language as we do, was adopted solely for the purpose of reserving to the people of the State the sovereign power of direct legislation by the process of the initiative and referendum upon the con-

ditions named, and no additional power was conferred separately upon the people of municipalities and counties.

We have already held that the amendment is in force and is self-executing as to general laws initiated by or referred to the people of the whole State. *Arkansas Tax Commission* v. *Moore,* 103 Ark. 48. That, we think, marks the limit of the power reserved or conferred, for to attempt to give any more force to the amendment would be to do violence to the language used, and would in effect amount to legislation by this court.

It is suggested that the amendment has not taken away from the Legislature authority, if it ever possessed it, to confer upon the people of municipalities and counties power to initiate and enact local measures, and that the Legislature has, by the Enabling Act, conferred such power with certain limitations and restrictions. We need not decide that question, for the power conferred by the Enabling Act was to initiate local measures which are not inconsistent with the general laws of the State, and none of the local measures now presented fall within that category. They are each inconsistent with general laws of the State. The two providing for county seat removals are in conflict with general statutes which prescribe the particular manner in which elections for the removal of county seats shall be initiated. The Garland County horse-racing bill and the Little Rock Sunday baseball measure are each inconsistent with criminal statutes of the State, which make criminal offenses of the things authorized by those two measures. The Sebastian County salary bill is also inconsistent with general statutes of the State prescribing the fees for county officers. Some of the officers of Sebastian County are now upon salaries prescribed by special statutes, but some of the officers look to general statutes to fix their fees, and the proposed measure, to that extent, is inconsistent with general laws.

We are of the opinion, therefore, that none of the proposed measures fall within the purview either of the amendment to the Constitution or the Enabling Act, and that they can not be submitted to the voters of the respective localities who have attempted to initiate them. The judgment in each of the cases is reversed, and the petitions for mandamus are dismissed.